BIRCH, Circuit Judge,
concurring in part and dissenting in part:
I wholeheartedly agree with the majority’s conclusion that the tenants in this case have alleged a violation of their constitutional right to contemporaneous and personal notice of a right to appeal their evictions. I write separately because I disagree with its wholesale rejection of the Supreme Court’s decision in Memphis Light, as well as the decision to grant qualified immunity.
The majority concludes that a government official could not have reasonably known that the summary condemnation of property and subsequent eviction of its residents without providing them personal notice of their right to challenge the decision was unconstitutional. A reasonable code enforcement officer, they argue, could have readily concluded that such notice was not required “because the remedial procedure available to the tenants was established by a published, generally available source, § 30A.11 of the City Code.” Maj. Op. at 1245. Section 30A.11 provides that “[a]ny person affected by any notice which has been issued in connection with the enforcement of any provision of this Code ... may request and shall be granted a hearing on the matter before the Code Enforcement Board [ (‘Board’) ].” Though facially appealing, the predicate for the majority’s conclusion unravels upon closer inspection.
In simplest terms, the futility of any appeal afforded by § 30A.11 would have been self-evident to any reasonable code enforcement officer in Rhodes’s position. It is clear that the Board has authority to condemn and vacate buildings. See Orlando, Fla., Code § 30A.42. The City Code does not, however, grant the Board authority to reverse, on appeal, an independent condemnation decision made by the City.[1] Notwithstanding § 30A.11, the Board’s jurisdiction is limited to “affording the proper relief consistent with the powers granted by Florida Statute and by this Chapter.” Id., § 5.05(g). The Florida legislature, however, only empowers local enforcement boards, in pertinent part, to “[i]ssue orders having the force of law to command whatever steps are necessary to bring a violation into compliance,” Fla. Stat. Ann. § 162.08(5) (2003), and not, for example, to review a city’s unilateral condemnation order.[2]
*1250 That limited jurisdiction is substantiated by the Board’s own understanding of its role in the code enforcement process. As clarified by the testimony of its chairman, Mr. Kuritzky, the Board is limited to the adjudication of the property owner’s guilt or innocence on alleged code violations and has no authority to reverse a city official’s condemnation order. There is simply no way for an evicted tenant to challenge such an order through Board action.[3] As such, the Board has no obligation to hear from evicted tenants, and the hearing provided to the tenants in this case was a mere “courtesy.” The Board’s own conduct during those hearings suggests as much. When some of the tenants petitioned the Board to defer its ruling at the first scheduled hearing until all tenants were given an opportunity to speak Mr. Kuritzky told them that the Board could “only make a determination whether or not the property is or is not in compliance with the code.” 12 July Hr’g Tr. at 49:21-25. At the second hearing called, Mr. Kuritzky again stated that “all [the Board] can do is determine if there is non-compliance.” 26 July Hr’g Tr. at 46:12-13. In fact, the second hearing was called, not to take action, but merely for the sake of good manners, “to allow the tenants ... to express their feelings and observations,” Id. at 3:15-19. Board members floundered at this meeting, finding it difficult to comprehend what relief could be afforded or even what the issue before them was. A venting session is no substitute for a meaningful opportunity to be heard, something the tenants were never afforded in this case. Without effective review, the City’s summary condemnation order was final and unappeala-ble and, therefore, constitutionally inadequate. In turn, statutory notice of the Board’s impotence in this regard is similarly unsatisfactory, for notice of an ineffectual opportunity to be heard is no notice at all.
Rhodes must have known this, as any code enforcement officer with his training and experience would have. At the time of the eviction notices, he had substantial experience at high levels of city government, and specific training in the mandates of due process. He was Chief of the Code Enforcement Bureau and the official to whom the City delegated the important responsibility of declaring dangerous structures uninhabitable. Over the years serving as the chief executive officer of his division, he had condemned over 400 buildings. Indeed, he testified in his deposition that he does not “ordinarily seek a condemnation order from the [B]oard,” Rhodes Dep. 122:7-8, that in the three prior apartment condemnation cases, the Board never reviewed his condemnation decisions, and that such a decision becomes a Board case only “[w]hen the property owner fails to comply with the original compliance schedule.” Rhodes Dep. 77:20-78:2. That the highest official in a city’s building safety department could have reasonably concluded that statutory notice of a sterile opportunity to be heard was constitutionally sufficient stretches the imagination to an untenable degree. In light of these inferences, we should have affirmed the denial of qualified immunity; at most, we should have remanded for fact finding on this issue.
Equally troubling is the majority’s out-of-hand rejection of the principles and clear import of the holding articulated by the Supreme Court in Memphis Light. It is beyond question that the constitutional right to notice and an opportunity to be heard before a person is finally deprived of property by government action is clearly established. Mullane, 339 U.S. at 313, 70 S.Ct. at 656-57. Without relying on Mem *1251 phis Light, however, the majority distills a further due process requirement: “[w]hen exigent circumstances prompt an emergency eviction, contemporaneous pre-deprivation notice is required,” such that “tenants must receive notice of their right to challenge the condemnation decision when they are provided with the notice to vacate the building.” Maj. Op. at 1237-1238. In doing so, the majority distinguishes the questions whether and when such notice must be provided from the method of delivering that notice, whether it be statutory or personal.
The general right to contemporaneous notice was articulated in Memphis Light with such clarity that a reasonable official would have realized that the tenants here were entitled to this type of notice. After all, if the rule applies to basic necessities in the home such as utilities, a fortiori, it clearly applies to the right to occupy a home in the first place. At a minimum, then, Memphis Light clearly establishes that contemporaneous notice of the right to appeal is constitutionally required before tenants may be evicted from their homes without warning.[4]
*1252 But the majority also rejects Memphis Light as clearly establishing that personal notice of such a right is also compelled by due process, and this is the basis for its decision to grant qualified immunity. For support, they refer to the Supreme Court’s recent conclusion that owners of property seized in the course of a criminal investigation have no constitutional right to “individualized notice of state-law remedies” to contest the seizure, or procedures to petition for the return of property, if those remedies and procedures “are established by published, generally available state statutes and case law.” West Covina, 525 U.S. at 241, 119 S.Ct. at 682. The Court distinguished Memphis Light because “the administrative procedures at issue [there] were not described in any publicly available document.” Id. at 242, 119 S.Ct. at 682.[5]
Seizing upon this questionable distinction, my esteemed colleagues view West Covina as the culmination of a century-old line of cases standing for the proposition that “a publicly available statute may be sufficient to provide ... notice because individuals are presumptively charged with knowledge of such a statute.” Maj. Op. at 1239. This, they argue, “provides the basis for a compelling argument that § 30A.11 of the Orlando City Code, standing alone, provides [sufficient] notice to the tenants of their right to challenge the con *1253 demnation order and thus satisfies due process.” Maj. Op. at 1240.
The argument creates only the illusion of consistency, however. The cases cited by the majority exclusively address self-executing statutes of limitations on abandoned claims, or other generally applicable legislative enactments. They do not address deprivations triggered by specific, individualized state action such as the condemnation order in this case.[6] The distinction is made even clearer in Texaco:
[A] series of cases ... have required specific notice ... before a driver’s license is suspended for failure to post security after an accident, before property is seized pursuant to a prejudgment replevin order, or before service is terminated by a public utility for failure to tender payment of amounts due [Mem--phis Light]. In each of those cases, however, the property interest was taken only after a specific determination that the deprivation was proper. In the instant case, the State of Indiana has enacted a rule of law uniformly affecting all citizens that establishes the circumstances in which a property interest will lapse through the inaction of its owner.
454 U.S. at 536-37, 102 S.Ct. at 796 (footnotes omitted) (emphasis added). Thus, where a deprivation is not the result of an individualized judicial or quasi-judicial determination, “[t]he Due Process Clause does not require a defendant to notify a potential plaintiff that a statute of limitations is about to run.” Id. at 536, 102 S.Ct. at 796. “The words ‘after notice and ... hearing’ ... connote a hearing appropriate to adjudicatory action, not to legislation or rule making.” Philadelphia Co. v. S.E.C., 175 F.2d 808, 818 (D.C.Cir.1948), vacated as moot, 337 U.S. 901, 69 S.Ct. 1047, 93 L.Ed. 1715 (1949) (mem.). In short, “a self-executing statute of limitations is [not] unconstitutional.” Texaco, 454 U.S. at 536, 102 S.Ct. at 796.
However, like the seizure in West Covi-na, the condemnation order here was not self-executing by virtue of the tenants’ fail *1254 ure to act. It was not the result of a “rule of law uniformly affecting all citizens.” Id. at 537, 102 S.Ct. at 796. It arose instead from an individualized, specific, and quasi-judicial agency determination by Rhodes that the living conditions of the condemned dwellings were dangerous to human health and potentially life threatening. West Co-vina and the case here, therefore, sit uneasily with the statute-of-limitations-cases on which the majority relies. Instead, they fall more comfortably under the rubric that personal notice is required where a deprivation is triggered by some case-specific government action.
This fundamental requirement was clearly enunciated over fifty years ago in Mullane. The statute there authorized the establishment of common trust funds and provided “for accountings twelve to fifteen months after the establishment of a fund and triennially thereafter.” Mullane, 339 U.S. at 308-09, 70 S.Ct. at 654-55. Thus, the beneficiaries of the trust, like “[t]he tenants in this case, ... could have turned to [the statute] to learn of their right[s],” Maj. Op. at 1241-1242, concerning the impending judicial settlement of their trust accounts. Yet, the Court deemed this minimalist approach incompatible with due process. 339 U.S. at 320, 70 S.Ct. at 660. The Court held that, for those beneficiaries whose individual whereabouts were known, personal notice was required. 339 U.S. at 318, 70 S.Ct. at 659.
[W]hen notice is a person’s due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it ..., [and], where conditions do not reasonably permit such notice, ... the form chosen [must] not [be] substantially less likely to bring home notice than other of the feasible and customary substitutes.
Id. at 315, 70 S.Ct. at 657-58. “Certainly sending [the beneficiaries] a copy of the statute months and perhaps years in advance does not answer this purpose.” Id. at 318, 70 S.Ct. at 659. If mailing the statute is insufficient, then obviously notice under the statute itself, without more, also shrinks under the unwavering gaze of due process scrutiny.
A little more than a decade later in Schroeder v. City of New York, 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962), the Court applied Mullane to a nonclaim statute of limitations and found statutory notice wanting. The statute in that case authorized government acquisition and diversion of certain river waters. It required notice by publication and posting only and provided a three-year limitations period within which a property owner could claim damages from the diversion. Id. at 209-10, 83 S.Ct. at 280-81. “Neither the newspaper publications nor the posted notices explained what action a property owner might take to recover for damages caused by the city’s acquisition, nor did they intimate any time limit upon the filing of a claim by an affected property owner.” Id. at 210, 83 S.Ct. at 281.
The Court rejected these forms of notice, acknowledging “[t]he general rule that emerges from the Mullane case ... that notice by publication is not enough with respect to a person whose name and address are known or very easily ascertainable and whose legally protected interests are directly affected by the proceedings in question.” Id. at 212-13, 83 S.Ct. at 282. Even if the property owner had constructive notice, the Court said, it “is far short of notice ... that the appellant had a right to be heard on a claim for compensation for damages.... That was the information which the city was constitutionally obliged to make at least a good faith effort to give personally to the” property owner. Id. at 213-14, 83 S.Ct. at 283 (emphasis added) (footnote omitted).
*1255 The ensuing decisions in Tulsa Professional Collection Services, Inc. v. Pope, 485 U.S. 478, 108 S.Ct. 1840, 99 L.Ed.2d 565 (1988), and Mennonite Board of Missions v. Adams, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983), are also instructive. In Mennonite, the Court held that due process requires personal notice to the recorded mortgagee of a proceeding to sell secured property at public auction for nonpayment of taxes. 462 U.S. at 798, 103 S.Ct. at 2711. The statute at issue explained the procedures for holding the tax sale as well as the procedures by which the mortgagee could redeem the property within two years of the sale. In rejecting the statutory notice provisions, the Court stated that it “ha[d] adhered unwaiveringly to the principle announced in Mullane.” Id. at 797, 103 S.Ct. at 2710-11 (citing, inter alia, Memphis Light, 436 U.S. at 13-15, 98 S.Ct. at 1562-63). Noting that the case was “controlled by the analysis in Mullane,” the Court articulated the applicable standard: “Notice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of any party, whether unlettered or well versed in commercial practice, if its name and address are reasonably ascertainable.” Id. at 798, 800, 103 S.Ct. at 2711, 2712.
At issue in Tulsa was another nonclaim statute extinguishing all creditor claims against an estate if they were not brought within two months of the commencement of probate proceedings. The statute provided for notice through publication only. Id. at 479, 108 S.Ct. at 1342. In holding that the statute violated the creditors’ due process rights, the Supreme Court acknowledged that “the State’s involvement in the mere running of a general statute of limitations generally [is injsufficient to implicate due process.” Id. at 485-86, 108 S.Ct. at 1345. Yet, it found that the probate court’s “involvement [in triggering the limitations period wa]s so pervasive and substantial that it must be considered state action,” id. at 487, 108 S.Ct. at 1346, in contrast to the “ ‘self-executing feature’ of a statute of limitations.” Id. at 486, 108 S.Ct. at 1345. As such, due process rights applied, and where a creditor was “known or ‘reasonably ascertainable,’ ” personal notice by mail was required. Id. at 488, 491, 108 S.Ct. at 1346, 1348 (citing Mennonite and Memphis Light).
There is a common thread running through all these cases. With limited exceptions such as abandonment, impossibility, or other measures likely to impart actual notice, personal notice is required when a deprivation is threatened by specific state action in individual cases. Notice by statute under these circumstances is inadequate, even if, at first glance, it appears to be a nonclaim statute of limitations. The principle applies with substantial force where a summary deprivation has already occurred, or there is a high risk of an erroneous determination and the cost of notifying interested parties is relatively low. “ [Particularly extensive efforts • to provide notice may often be required when the State is aware of a party’s inexperience or incompetence.” Mennonite, 462 U.S. at 799, 103 S.Ct. at 2712 (citing Memphis Light, 436 U.S. at 13-15, 98 S.Ct. at 1562-64).[7]
*1256 The decision in West Covina sails alone in these waters. It floats adrift from any legal flotilla, tethered neither to the rule of personal notice forged in Mullane, Schroeder, Memphis Light, Mennonite, and Tulsa, nor to the principle developed in Reetz and its progeny exempting laws of general applicability from the dictates of due process. This alienation is explained by the notable differences between it and other due process cases. For example, the Court found it important in West Covina that “neither the Federal Government nor any State requires officers to provide individualized notice of the procedures for seeking return of seized property.” 525 U.S. at 242^43, 119 S.Ct. at 682. By contrast, the vast majority of circuits have held that persons deprived of property through civil government action are entitled to personal notice of their right to appeal the deprivation.[8] The distinctions between the condemnation order of an administrative officer in the context of a civil code violation and the seizure of property by police grappling with the inherent exigencies of a criminal homicide investigation are stark indeed. Moreover, the sense of urgency and confusion associated with the permanent and irretrievable loss of a person’s home, land or other basic necessity, and the cardinal importance of intelligible procedures designed to prevent unwarranted deprivations, did not exist in West Covina. See 525 U.S. at 236, 119 S.Ct. at 679 (stating that the police seized mainly small items of personal property including guns, ammunition and some cash). Finally, there is no indication in that opinion that a failure by the property owners to activate their state-law remedies would have resulted in a permanent deprivation of the property seized as in these other cases.
In fact, the holding in West Covina applies only to the narrow context of a search and seizure performed during routine criminal law enforcement. The decision, therefore, restricts due process principles only insofar as it rejects a “general rule that notice of remedies and procedures is required” for every deprivation. Id. at 242, 119 S.Ct. at 682. We advance no such rule. Instead, we conclude the opposite: the entitlement to such notice is not necessarily foreclosed merely because the remedies and procedures are delineated in statutory form. See Maj. Op. at 1243-1244. As my colleagues express so effectively, “[t]he law does not entertain the legal fiction that every individual has achieved a state of legal omniscience,” or that every citizen “know[s] all of the law all of the time.” Maj. Op. at 1243. Indeed, low-income tenants evicted from their homes without prior notice cannot be charged with knowledge of narrow statutory procedures buried deep within city ordinances; under those circumstances, they would have all the clarity of a byzantine cathedral.
In light of these differences, West Covi-na did not muddy otherwise clear waters. Under the bright illumination of Supreme Court thought on due process and constitutionally sufficient notice, West Covina pales. By comparison, it is marginal and anomalous. A reasonable code enforcement officer with Rhodes’s rank and expe *1257 rience would neither have been confused by it nor would have relied on it.[9] Instead, a responsible government official, acting rationally, would have looked to the deeply ingrained case law springing from Mul-lane. The majority itself follows this path in concluding that Rhodes had an affirmative constitutional obligation to provide tenants with contemporaneous and -personal notice of their right to appeal his condemnation decision. In doing so, they rely on the notice standard in Mullane, as well as their “practical understanding of statutory notice”: “the residents of Lafayette Square were provided with no more than thirty-six hours to vacate their homes, and, during this limited period of time, they had to complete a multitude of tasks, which ranged from securing alternate shelter to collecting their personal belongings to making accommodations for work or school.” Maj. Op. at 1243. As such, they did not have a reasonable opportunity to educate themselves on the niceties of their, presumably efficacious, statutorily protected right of appeal. Maj. Op. at 1243-1244.
One could think that a high-ranking government official like Rhodes, who had condemned over 400 buildings, would have understood this. Yet, somehow, the majority finds this unclear.[10]
[S]ome broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts. For example, if some authoritative judicial decision decides a case by determining that “X Conduct” is unconstitutional without tying that determination to a particularized set of facts, the decision on “X Conduct” can be read as having clearly established a constitutional principle.
Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir.2002) (citation omitted). “[I]n the absence of fact-specific case law, the plaintiff may overcome the qualified-immunity defense when the preexisting general constitutional rule applies ‘with obvious clarity to the specific conduct in question.’ ” Id. at 1352 (quoting United States v. Lanier, 520 U.S. 259, 271, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997)). Under Mullane, “X Conduct” is the case-specific, civil deprivation of substantial property rights, permanently and irreversibly, without prior, personal notice “reasonably certain to inform those affected,” whose identity and whereabouts are known, even in the case where the substance and frequency of the proceedings are published by statute and publicly promulgated. 339 U.S. at 315, 318-320, 70 S.Ct. at 657, 659-60. “X Conduct” is also what happened here: the drumhead condemnation of, and eviction from, house and home with minimal, and questionable, statutory notice that assaults the letter and spirit of the uncompromising demands in Mullane, Schroeder, Memphis Light, Mennonite, and Tulsa, all of which apply in this case with “obvious clarity.” Rhodes is not entitled to qualified immunity.
In this regard, I respectfully dissent.

. Such decisions are made pursuant to §§ 30A.42 ("Procedure for Vacating of Structures or Premises”), 30A.45 ("Procedure for Emergency City Action”), or 30A.38 ("Public Nuisances”).

. Under § 5.08, "[a]n aggrieved party ... may appeal a final administrative order of the [Board] to the Circuit Court.” Obviously, if the Board has no authority to reverse a city’s condemnation decision, there is nothing to challenge on appeal. In addition, § 5.08 uses the term "party” instead of "person affected,” as § 30A.11 does. While evicted tenants are certainly affected by a condemnation decision, they are not an "aggrieved parties.” See KuritzkyDep. 29:13-15.

. Likewise, the City provides no appeals process to review its own condemnation decisions. Grandin Dep. 18:1-3 (City of Orlando, Director of Planning and Development).

. Cases from other circuits also make this proposition abundantly clear. It is true that, thus far, we look only to our own precedent and the decisions of the United States Supreme Court and the supreme court of the relevant state in this circuit to determine whether law is clearly established. See Marsh v. Butler County, Ala., 268 F.3d 1014, 1031 n. 9 (11th Cir.2001) (en banc). Language in a number of fairly recent Supreme Court opinions, however, has signaled a different approach. See, e.g., Hope, 536 U.S. at 747 n. 13, 122 S.Ct. at 2519 n. 13 (2002) (noting in its qualified-immunity analysis that there were “apparently no decisions on similar facts from other Circuits”); Wilson v. Layne, 526 U.S. 603, 617, 119 S.Ct. 1692, 1700, 143 L.Ed.2d 818 (1999) (refusing to find that "the law on third-party entry into homes” was clearly established, in part because no cases either in the relevant jurisdiction or from "a consensus of cases of persuasive authority” had been presented); United States v. Lanier, 520 U.S. 259, 269, 117 S.Ct. 1219, 1226-27, 137 L.Ed.2d 432 (1997) (observing that, although "disparate decisions in various Circuits might leave the law insufficiently certain even on a point widely considered, such a circumstance may be taken into account in deciding whether the warning [to government officials] is fair enough”); Id. at 269, 117 S.Ct. at 1226 (stating that when "applying the rule of qualified immunity,” the Court has "referred to decisions of the Courts of Appeals when enquiring whether a right was 'clearly established’ ”) (emphasis added); Elder v. Holloway, 510 U.S. 510, 516, 114 S.Ct. 1019, 1023, 127 L.Ed.2d 344 (1994) (counseling a lower court to "use its ‘full knowledge of its own [and other relevant] precedents’” in a qualified immunity analysis) (alteration in original) (emphasis added) (citation omitted); Anderson v. Creighton, 483 U.S. 635, 646, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987) (referring to "current American law” when describing reasonableness for qualified immunity purposes) (emphasis added).
Under "current American law,” the rule in Memphis Light is unmistakable. Sister courts have held that those summarily evicted through condemnation procedures are entitled to contemporaneous notice of their right to appeal. See, e.g., Flatford v. City of Monroe, 17 F.3d 162, 169 (6th Cir.1994); McGee v. Bauer, 956 F.2d 730, 737-38 (7th Cir.1992); Wilson v. Health & Hosp. Corp., 620 F.2d 1201, 1214-15 (7th Cir.1980) ("havfing] little difficulty in finding that Mullane and the due process clause require personal notice of the individual's right to a hearing prior to the government’s depriving the individual of any property interest, notwithstanding the 'notice' provided by the public character of the ordinance itself.... [W]e do not believe it is adequate for the government simply to rely upon the time worn adage that 'ignorance of the law is no excuse.' ”).
Persons deprived of other forms of property are also frequently entitled to such notice. For cases requiring notice of the right to appeal a denial of statutory benefits, see, e.g., Sullivan v. Barnett, 139 F.3d 158, 173 (3d Cir.1998), rev’d on other grounds, 526 U.S. 40, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (suspension of employee medical benefits); Davis v. Mansfield Metro. Hous. Auth., 751 F.2d 180, 185 (6th Cir.1984) (denial of eligibility for Section 8 housing program); Holbrook v. Pitt, 643 F.2d 1261, 1280-81 (7th Cir.1981) (denial *1252 of retroactive housing assistance payments); Bliek v. Palmer, 102 F.3d 1472, 1476 (8th Cir.1997) (reduction of food stamp benefits to cover prior overissuances); Gonzalez v. Sullivan, 914 F.2d 1197, 1203 (9th Cir.1990) (denial of disability benefits); Jordan v. Benefits Review Bd. of the U.S. Dep’t of Labor, 876 F.2d 1455, 1459-60 (11th Cir.1989) (denial of black lung benefits). For cases requiring notice of possible exemptions to postjudgment seizures and the procedures for claiming them, see, e.g., Dionne v. Bouley, 757 F.2d 1344, 1352 (1st Cir.1985); McCahey v. L.P. Investors, 774 F.2d 543, 549 (2d Cir.1985); Finberg v. Sullivan, 634 F.2d 50, 62 (3d Cir.1980); Cinea v. Certo, 84 F.3d 117, 122 (3d Cir.1996); Reigh v. Schleigh, 784 F.2d 1191, 1196 (4th Cir.1986); Aacen v. San Juan County Sheriffs Dep’t, 944 F.2d 691, 699 (10th Cir.1991). For cases requiring notice of the right to challenge other types of seizures, see, e.g., Anderson v. White, 888 F.2d 985, 992 (3d Cir.1989) (interception of federal tax refunds to cover child support delinquencies); DiCesare v. Stuart, 12 F.3d 973, 978 (10th Cir.1993) (seizure of sick horses by county official); but see Ramirez-Osorio v. INS, 745 F.2d 937, 945-46 (5th Cir.1984) (Due process does not require blanket notice by the INS to de-portable detainees of the right to seek asylum.).

. The distinction's legitimacy is hardly indisputable. The Court in Memphis Light did note that "the opportunity to invoke [a dispute resolution] procedure, if it existed at all, depended on the vagaries of 'word of mouth referral.’ " 436 U.S. at 14 n. 14, 98 S.Ct. at 1563 n. 14. It did so, however, in the course of determining whether the plaintiffs had actual notice of those procedures. Id. at 13-14, 98 S.Ct. at 1562-63. That threshold finding was important because "the Due Process Clause does not require notice where those claiming an entitlement to notice already knew the matters of which they might be notified.” Moreau v. Fed. Energy Regulatory Comm’n, 982 F.2d 556, 569 (D.C.Cir.1993); accord EEOC v. Pan American World Airways, Inc., 897 F.2d 1499, 1508 (9th Cir.1990) ("Actual knowledge of the pendency of an action removes any due process concerns about notice of the litigation.”); Crocker v. Fluvanna County Va. Bd. of Pub. Welfare, 859 F.2d 14, 16 (4th Cir.1988) (concluding that failure of a government employer to inform discharged employee of grievance rights where employee had actual knowledge of them did not violate due process); cf. Codd v. Velger, 429 U.S. 624, 627-28, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977) (holding that a name-clearing hearing, ordinarily required for an employee stigmatized by discharge, is not required where the employee "does not challenge the substantial truth of the material in question”). Had there been actual notice, the Court would not have needed to decide whether the notice provided was constitutionally inadequate. The distinction in Memphis Light, therefore, had nothing to do with the subsequent determination that the utility company had, in fact, violated the Due Process Clause.

. See, e.g., Atkins, 472 U.S. at 129, 105 S.Ct. at 2528-29 (concluding that a congressional modification to the food-stamp program is not subject to procedural due process because it “does not concern the procedural fairness of individual eligibility determinations[, but rjather ... involves a legislatively mandated substantive change in the scope of the entire program”) (emphasis added); Locke, 471 U.S. at 108, 105 S.Ct. at 1799-1800 (upholding a federal statute because it adequately notified claimants of actions necessary to avoid abandonment of a mining claim. "In altering substantive rights through enactment of rules of general applicability, a legislature generally provides constitutionally adequate process simply by enacting the statute, publishing it, and ... affording those within the statute's reach a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements.”) (emphasis added); Texaco, 454 U.S. at 523, 538, 102 S.Ct. at 789, 797 (upholding statutory return of abandoned mineral interests to the owner of the surface rights without prior notice and opportunity to be heard); Anderson Nat'l Bank v. Luckett, 321 U.S. 233, 241, 243-44, 64 S.Ct. 599, 604-05, 88 L.Ed. 692 (1944) (upholding statute requiring banks to transfer funds from all inactive and unclaimed deposits to the state without personal notice to depositors); North Laramie Land Co., 268 U.S. at 283, 45 S.Ct. at 494 (upholding statutory notice of time to file objections to, and a claim for damages from, a legislative decision by a board of county commissioners to construct a new road in part because "[sjuch statutes are universally in force and are general in their application ”) (emphases added); Reetz, 188 U.S. at 509, 23 S.Ct. at 392 (upholding as sufficient notice a "statute fix[ing] the time and place of meeting of” a board of registration at which an applicant to practice medicine could have requested an ex ante hearing prior to any board action on the application but not addressing in any way the statute’s failure to afford notice of an applicant’s right to challenge ex post the board’s decision in any given case).

. As the majority points out, whether the content of the notice at issue is the right to challenge a deprivation or the potential deprivation itself “makes no difference.” Maj. Op. at 1239. Just as the opportunity to defend substantial rights and interests that are to be adjudicated in an impending hearing is wasted if the defendant is not made aware of it, so is the opportunity to challenge a deprivation if the challenger is unaware of the ability and the procedures by which to do so. In this respect, due process applies whether adjudication is used as a sword or a shield. See *1256 Tulsa, 485 U.S. at 488, 108 S.Ct. at 1346 (observing that whether "notice [of an impending probate court proceeding] seeks only to advise creditors that they may become parties rather than that they are parties [is irrelevant], for if they do not participate in the ... proceedings, the nonclaim statute terminates their property interests.”); Boddie v. Connecticut, 401 U.S. 371, 376-77, 91 S.Ct. 780, 785, 28 L.Ed.2d 113 (1971) (noting that "[r]esort to the judicial process by ... plaintiffs is no more voluntary in a realistic sense than that of the defendant called upon to defend his interests in court”).

. For case holdings, see infra note 4.

. Interestingly, Rhodes failed to cite West Co-vina either to the district court or to us in his briefs.

. The majority opinion rejects the factors in Memphis Light: that “the notice is given to thousands of customers of various levels of education, experience, and resources” concerning a deprivation of basic necessities “the uninterrupted continuity of which is essential to health and safety.” 436 U.S. at 14 n. 15, 98 S.Ct. at 1563 n. 15. Ironically, the exigencies identified by the majority in this case are important, in large part, because shelter is a basic necessity, the guarantee of which is diminished by the relative lack of "education, experience, and resources” at the tenants’ disposal.