Harris v. USAir, Inc.                          CV-95-618-SD 06/30/97
**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF NEW HAMPSHIRE**


Judith F. Harris

        v.                                 Civil No. 95-618-SD

USAir, Inc.


## O R D E R


In this civil action, plaintiff Judith F. Harris alleges
that defendant USAir, Inc., discriminated against her in
violation of the Air Carrier Access Act of 1986 (ACAA), codified
as amended at 49 U.S.C. § 41705, by refusing to allow her to
board a return flight from New Orleans to Boston without an
attendant.

Presently before the court is defendant's motion for summary
judgment, to which plaintiff objects.


### Background[1]

As a result of a 1970 automobile accident, plaintiff has an
injured spinal cord and is unable to stand or walk.  Harris
Deposition at 18.  She is mobile through the use of a manual

---

[1]The court's recitation of the facts relevant to the instant
motion are either not in dispute or have been alleged by the
plaintiff.

wheelchair, which she maneuvers without assistance.  Id. at 25-26.  Plaintiff can transfer by herself to and from her wheelchair to other surfaces, has control of her bowels, takes care of her own personal hygiene, and is substantially independent in her daily activities.  Id. at 26-30, 46-47; Plaintiff's Interrogatory Answers 15, 20.  She is also able to drive herself in a customized automobile.  Harris Deposition at 27.

In December 1994, plaintiff purchased a round-trip ticket from a travel agency for travel on a USAir flight from Boston, Massachusetts, to New Orleans, Louisiana.  Id. at 41-42.  She specifically requested that the travel agent notify the carrier that she was handicapped so they would make arrangements for her luggage and wheelchair.  Id.  Plaintiff traveled, by herself, to New Orleans on January 17, 1995.  Id.  Plaintiff admits she needed assistance transferring from her wheelchair to the aisle chair to her passenger seat on the plane and that USAir flight attendants lifted her in and out of the different positions.  Id. at 45.  Plaintiff also admits that during a layover in Washington, D.C., she requested assistance in using the plane's lavatory, and upon realizing that the room was too small for her to access her catheter, she requested flight attendants to take her into the airport's restroom.  Id. at 54-60.  Although she originally intended to stay in New Orleans for approximately

three months, on January 20, 1995, plaintiff telephoned USAir to arrange for a return flight back to Boston, id. at 76, at which point the USAir reservations representative informed plaintiff that she needed an attendant in order to travel on a USAir flight. Id. at 77. When plaintiff asked why, the USAir employee, according to plaintiff, stated that her manual required that blind or handicapped persons travel with someone. Id. Plaintiff then spoke with a USAir supervisor, who gave her the same instruction. Id. at 78. Plaintiff protested, informing the supervisor that she had flown to New Orleans by herself. After an extended discussion, the supervisor told plaintiff that her daughter could fly down to New Orleans to accompany her back to Boston, at no charge. Id. at 79. Plaintiff's daughter Kara was a high school student at the time, Kara Harris Deposition at 8, and she was forced to miss a day of classes to attend to her mother, id. at 10. Kara was not given explicit instructions by USAir as to why she was required to travel with her mother or regarding her function as an attendant, id. at 13-14, and she testified that, in an emergency, the most she could do for her mother would be to try and obtain assistance from flight attendants, id. at 34.

Plaintiff argues that USAir discriminated against her, because she is handicapped, by requiring her to have an

3

attendant.  Defendant counters by stating that it justly determined, based on plaintiff's flight to New Orleans, that it was unsafe for her to travel without an attendant and that USAir abided by the regulations, promulgated under the ACAA, at 14 C.F.R. § 382.35(c), in providing Kara with free transportation to and from New Orleans to attend to her mother.

Discussion

Plaintiff seeks redress against USAir under the ACAA, which does not by its express terms provide for a private cause of action.  Therefore, the question is whether a private cause of action ought to be appended to the ACAA as a matter of federal common law so private parties can enforce the substantive obligations contained therein.  Although defendant does not raise this issue in its motion, the court feels compelled to do so, as the scope of Article III jurisdiction over this case hangs in the balance.  Rule 12(h), Fed. R. Civ. P. (providing that courts may raise issues of subject matter jurisdiction even when uncontested by the parties).

## 1.  The Implication Doctrine

When a statute is silent as to whether its substantive provisions may be enforced through private litigation, courts may

fill the resulting gap left by Congress by implying a private cause of action.  Northwest Airlines v. Transport Workers Union, 451 U.S. 77, 93-94 (1981); Cannon v. University of Chicago, 441 U.S. 677, 688 (1979).  As a threshold matter, implying a private cause of action is inappropriate unless the statute grants a benefit to a particular class of persons.  Cort v. Ash, 422 U.S. 66, 78 (1975).  However, this threshold inquiry merely determines whether Congress conferred a federal right on individuals in the relevant class, and an affirmative answer is not dispositive of the entirely separate question of whether that federal right is enforceable by private litigation.  The key focus to the enforcement question is congressional intent to extend or deny a private right of action to the benefitted class.  Middlesex County Sewerage Auth., supra, 453 U.S. at 13 ("The key to the inquiry is intent of the Legislature."); Northwest Airlines, supra, 451 U.S. at 91 ("The ultimate question . . . is whether Congress intended to create the private remedy . . . that the plaintiff seeks to invoke."); Transamerica Mortg. Advisors, Inc. v. Lewis, 444 U.S. 11, 18 (1979); Touche Ross & Co. v. Redington, 442 U.S. 560, 568 (1979) ("our task is limited to determining whether Congress intended to create the private right of action asserted").  In addition, courts may consider whether the contemplated remedy traditionally has been relegated to federal

5

law.  <u>Cort</u>, <u>supra</u>, 422 U.S. at 78.  If so, then states have a diminished interest in rigid adherence to separation of powers that would otherwise counsel against exercise of federal common lawmaking authority in favor of a private right of action.  <u>See</u> <u>Nacional de Cuba v. Sabbatino</u>, 376 U.S. 398, 423-24 (noting that when "the problems involved are uniquely federal in nature" federal common law making authority is broader).

The ACAA clearly grants the benefit of federal rights to a particular class of which plaintiff is a member.  The Federal Aviation Act of 1958 recognized the "public right of freedom of transit through the navigable airspace of the United States."  49 U.S.C. § 1304.  The ACAA, which amended the Federal Aviation Act, extended this right to the disabled by prohibiting discrimination in airline transit against "otherwise qualified handicapped individuals."  S. REP. No. 99-400, at 2 (1986), *reprinted in* U.S.C.C.A.N. 2328, 2329; 132 CONG. REC. S11,784, 11,787 (daily ed. Aug. 15, 1986) (statement of Sen. Metzenbaum) (the purpose of this legislation is "to eliminate discrimination in services provided to handicap[ped] individuals by airline carriers"); 132 CONG. REC. H7193 (daily ed. Sept. 18, 1986) (statement by Rep. Mineta ("The bill now before us will make it clear that airlines may not discriminate against handicapped persons.").  Because the plaintiff is undisputedly an "otherwise qualified handicapped

6

individual," the ACAA grants her a federal right to equal access to airline transit.

Turning now to the question of whether plaintiff may enforce her federal right through private litigation, this court finds that the ACAA contains a private cause of action. Had the ACAA been enacted recently, this court would have concluded that no private right of action was appropriate. Recently, the court in Seminole Tribe of Florida v. Florida, ___ U.S. __, 116 S. Ct. 1114 (1996), noted that "[w]here Congress has created a remedial scheme for the enforcement of a particular federal right, we have . . . refused to supplement that scheme with one created by the judiciary." Id. at 1132 (citing Schweiker v. Chilicky, 487 U.S. 412, 423 (1988)). The ACAA contains public enforcement procedures under which the Department of Transportation is to secure equal access to airline transportation for the handicapped. Under Seminole Tribe, this court would be unwilling to exercise common lawmaking authority to broaden the enforcement scheme put in place by Congress with an implied private cause of action. However, the ACAA was not enacted recently, and the Court has made clear that "evaluation of congressional action 'must take into account its contemporary legal context.'" Morse v. Republican Party of Virginia, ___ U.S. ___, ___, 116 S. Ct. 1186, 1211 (1996) (citing Cannon v. University of Chicago, supra,

7

441 U.S. at 698-99). In 1986 when the ACAA was enacted, courts had not yet expressed unwillingness to supplement a remedial scheme under a statute with an implied private right of action. Because Congress enacted the ACAA against a backdrop of decisions in which private rights of action were implied despite the existence of an express remedial scheme in the statute, Seminole Tribe must be ignored for purposes of this analysis because retroactive application of the presumption enunciated in Seminole Tribe may actually work in derogation of congressional intent.

2. Implied Cause of Action under ACAA

The issue of whether there is a private cause of action under the ACAA is one of first impression in this circuit. Two other circuit courts have held in favor of a private cause of action. See Shinault v. American Airlines, 936 F.2d 796 (5th Cir. 1991); Tallarico v. Trans World Airlines, Inc., 881 F.2d 566 (8th Cir. 1989); see also Adiutori v. Sky Harbor Int'l Airport, 880 F. Supp. 696, 700 (D. Ariz. 1995) (stating that "[n]o party disputes that the ACAA impliedly provides for a private right of action"); ADAPT v. SkyWest Airlines, Inc., 762 F. Supp. 320 (D. Utah 1991) (assuming a cause of action under the ACAA without discussion). This court agrees with the conclusions reached in Shinault and Tallarico, but disagrees with the reasoning

8

mobilized in support of those conclusions.  The Fifth Circuit in Shinault provided scant reasoning beyond a cite to the Eighth Circuit's opinion in Tallarico, the first case to consider the issue.

The Tallarico court relied on a dubious interpretation of the legislative history of the ACAA to support its conclusion that the statute should have a private right of action.  The Tallarico court based its conclusion on the fact that Congress passed the ACAA in 1986 to overturn the Supreme Court's decision in United States Dep't of Transp. v. Paralyzed Veterans of America, 477 U.S. 597 (1986).  132 CONG. REC. S11,784 (daily ed. Aug. 15, 1986) (statement of Sen. Dole presenting S. 2703).  In that case, the Paralyzed Veterans of America (PVA) challenged the regulations promulgated by the Civil Aeronautics Board (CAB), the administrative agency authorized to enforce section 504 of the Rehabilitation Act of 1973, which prohibits discrimination against handicapped persons "in any program or activity receiving federal financial assistance."  29 U.S.C. § 794.  The challenged provision of the regulations was the CAB's conclusion that its authority under the Rehabilitation Act was limited to regulating air carriers that directly received federal financial assistance. DOT v. PVA, supra, 477 U.S. at 602.  The PVA argued that the CAB's authority under the Rehabilitation Act reaches all

9

commercial air carriers, since all airlines indirectly benefit from federal assistance to airport operators. Id. at 603. The Supreme Court disagreed, holding that commercial airlines do not receive federal financial assistance such that they are subject to the prohibitions of the Rehabilitation Act. Id. at 608-13. This decision left disabled passengers without federal rights against discrimination by commercial air carriers. Congressional reaction in passing the ACAA was swift and directly aimed at overruling the Court's decision.

The Tallarico court reasoned that this history of the ACAA indicates that Congress intended the ACAA to place handicapped individuals subject to discrimination by private commercial airlines on the same footing as handicapped individuals subject to discrimination by federally subsidized airlines. The Tallarico court reasoned that since the latter could enforce their rights against discrimination by a private cause of action under the Rehabilitation Act, so too Congress intended the former to have a private right of action under the ACAA.

The flaw in the Tallarico court's reasoning is that the Court did not address the issue of the scope of private remedies available under the Rehabilitation Act. The controversy in DOT v. PVA was not private litigation instigated by the victim of alleged discrimination. Rather, the controversy was brought by

10

the PVA challenging the CAB's conclusion that federal regulatory authority did not extend to private commercial airlines. The Court therefore addressed only the issue of whether disabled passengers of private commercial airlines had federal rights against discrimination and did not touch on the separate issue of whether those federal rights would be enforceable by private litigation. It is a mistake to assume, as did the Tallarico court, that in overruling DOT v. PVA, Congress indicated intent to place ACAA plaintiffs on the same footing with Rehabilitation Act plaintiffs with respect to both the scope of federal rights against discrimination and the entitlement to private enforcement of those rights. Rather, the only inference to be drawn is that Congress intended to extend to ACAA plaintiffs equal treatment as Rehabilitation Act plaintiffs with respect to federal rights against discrimination. However, no inferences can be drawn from the link between the ACAA and DOT v. PVA about an issue not even raised by DOT v. PVA; namely, the issue of private enforcement.

Nonetheless, there is other evidence that Congress intended a private right of action under the ACAA. Congressional intent in favor of a private cause of action "may appear implicitly in the language or structure of the statute, or in the circumstances of its enactment." Transamerica, *supra*, 444 U.S. at 18

The circumstances of the ACAA's enactment provide the

11

strongest evidence. The ACAA was enacted as a strand in a vast net of federal civil rights law. Of the civil rights statutes in force when the ACAA was enacted, three, including the Fair Housing Act, 20 U.S.C. § 1681, et seq. (1997); Title II, 42 U.S.C. § 3601, et seq. (1997); and Title VII, 42 U.S.C. § 2000, et seq., specifically extended a private right of action. The three other civil rights states, Title VI of the Civil Rights Act of 1984, 42 U.S.C. § 2000d, et seq. (1997); the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq. (1997); and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq. (1997), did not explicitly address the issue of private enforcement. However, by the time the ACAA was enacted in 1986, federal courts had implied causes of action under all three civil rights statutes that did not explicitly address private enforcement. Cannon, supra, 441 U.S. at 694-703 (discussing implied causes of action under Title VI and IX of the Civil Rights Act of 1964).[2]

_____

[2]See, e.g., Miener v. Missouri, 673 F.2d 969, 973 (8th Cir. 1982), cert. denied, 459 U.S. 909, 916 (1983) (recognizing private right of action under Rehabilitation Act); Doe v. New York Univ., 666 F.2d 761, 775 (2d Cir. 1981); Pushkin v. Regents of Univ. of Colorado, 658 F.2d 1372, 1378 (10th Cir. 1981); Helms v. McDaniel, 657 F.2d 800, 806 n.10 (5th Cir. 1981), reh'g denied, 664 F.2d 291 (11th Cir. 1981), cert. denied, 455 U.S. 946 (1982); Kling v. Los Angeles County, 633 F.2d 876, 878 (9th Cir. 1980); NAACP v. Medical Center, Inc., 599 F.2d 1247, 1258-59 (3d Cir. 1979); Lloyd v. Regional Transp. Auth., 548 F.2d 1277, 1284-85 (7th Cir. 1977); see also Hurry v. Jones, 734 F.2d 879, 886 (1st Cir. 1984) (relying on Consolidated Rail Corp. v. Darrone, 465 U.S. 624, 632-33 (1984).

When the ACAA was passed in 1986, every civil rights statute in force at that time was enforceable by private litigation. Congress is presumed to have been aware that courts would imply private causes of action under civil rights statues in the face of legislative silence. Given this awareness, Congress would not have remained silent on the issue of private enforcement of the ACAA if no private right of action were intended.

Also, Congress repealed and replaced the ACAA in 1995 without altering the enforcement provisions after two circuits courts and a district court had found a private right of action. Although legislative inaction in the face of a judicial interpretation of a statute does not always indicate congressional acquiescence in that interpretation, such acquiescences may be properly inferred in some instances. When Congress amends a statute without altering the interpreted provision, courts may regard Congress's failure to displace the judicial interpretation as evidence of its correctness. SUTHERLAND STAT. CONST. § 49.10 (5th ed.). Here, Congress's failure to displace a judicially imposed private cause of action when the statute was amended evidences congressional acquiescence in that construction of the statute. For the foregoing reasons, the court finds that plaintiff has a cause of action under the ACAA.

13

## Emotional Distress Damages

The court finds it necessary to decide now whether plaintiff may recover emotional damages under the ACAA, since she claims no other damages.  Again, there is no significant evidence in the legislative history surrounding the passage of the ACAA to indicate what types of private remedies Congress may have intended.  Therefore, the court relies on the well-established canon of statutory construction, "The existence of a statutory right implies the existence of all necessary and appropriate remedies unless Congress expressly indicates otherwise." Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 239 (1969). Because Congress did not expressly limit the available remedies under the ACAA, plaintiffs may seek all appropriate remedies, including emotional distress damages.  This court follows the Fifth and Eighth Circuits in holding that the ACAA allows recovery for emotional distress damages.  See Shinault, supra, 936 F.2d at 804; Tallarico, supra, 881 F.2d at 571 (arguing that the ACAA is more closely analogous to antidiscrimination statutes that allow recovery of emotional distress damages, such as section 1983, than to those that do not).

## Summary Judgment Standard

Summary judgment is appropriate when there is no genuine

14

issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed. R. Civ. P.; <u>Lehman v. Prudential Ins. Co. of Am.</u>, 74 F.3d 323, 327 (1st Cir. 1996). The court's function at this stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Stone & Michaud Ins. v. Bank Five for Savings</u>, 785 F. Supp. 1065, 1068 (D.N.H. 1992) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)). The burden is on the moving party to establish the lack of a genuine, material factual issue, <u>Finn v. Consolidated Rail Corp.</u>, 782 F.2d 13, 15 (1st Cir. 1986), and the court must view the record in the light most favorable to the nonmovant, according the nonmovant all beneficial inferences discernable from the evidence. <u>Caputo v. Boston Edison Co.</u>, 924 F.2d 11, 13 (1st Cir. 1991). Nevertheless, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." <u>Medina-Munoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).

When the nonmovant bears the burden of persuasion at trial, to avoid summary judgment, he must make a "showing sufficient to establish the existence of [the] element[s] essential to [his]

15

case." Celotex Corp. v. Catrett, 477 U.S. 317 322-23 (1986). It is not enough to "rest on mere allegation[s] or denials of its pleading." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S. 1018 (1994) (quoting Anderson, supra, 477 U.S. at 256.

Plaintiff's Claim of Discrimination by USAir

ACAA[3] provides that an air carrier may not discriminate against an otherwise qualified individual on the following grounds:

> (1) The individual has a physical or mental impairment that substantially limits one or more major life activities.[4]
> (2) The individual has a record of such impairment.
> (3) The individual is regarded as having such impairment.

49 U.S.C. § 41705. The regulations promulgated under the ACAA provide that "a carrier shall not require that a qualified handicapped individual travel with an attendant as a condition of being provided air transportation." However, the regulations provide an exception under which a carrier may require "[a]

---

[3]Congress repealed 49 U.S.C. § 1374 on July 4, 1994 (Pub. L. No. 103-272, § 7(b), 108 Stat. 1379) and replaced it with 49 U.S.C. § 40101-49105 without substantive change.

[4]Defendant acknowledges that plaintiff is a qualified individual with such a physical impairment and is protected under the ACAA. Defendant's Motion at 8.

person with a mobility impairment so severe that the person is unable to assist in his or her own evacuation of the aircraft" to travel with an attendant as a condition of being provided air transportation "if the carrier determines that an attendant is essential for safety." 14 C.F.R. Pt. 382.35(b)(3). USAir required plaintiff to travel with her daughter Kara as a condition of providing her air transportation from New Orleans to Boston. The issue is whether USAir was motivated to require plaintiff to fly with an attendant by a determination that she, if unattended, posed a threat to airline safety because she could not assist in her own evacuation. If USAir was motivated by any other reason than airline safety, such reason would be illegitimate, rendering unlawful and discriminatory USAir's refusal to transport plaintiff without an attendant. As is typically the case in assessing allegations of discrimination, the principal focus is on the airline's subjective motivation, whether impermissible or not. However, this court believes that there should also be an objective component to the inquiry as well--whether the airline's determination that the unattended handicapped individual posed a threat to safety was objectively reasonable. The objective component of the inquiry is necessary to ferret out cases where the airline is truly motivated by a concern for airline safety, but, nonetheless, that safety concern

17

is based on impermissible assumptions about the handicapped; for instance, that handicapped persons pose a safety threat because they are (generally) incapable of helping themselves.

As long as an airline's safety concerns are objectively reasonable, the law forgives reasonable mistakes, even when the evidence indicates that the handicapped individual could, in fact, assist in his or her own evacuation. The regulations imply that an airline's reasonable determinations of airline safety are entitled to deference, providing that an attendant may be required "if the *carrier* determines that an attendant is essential for safety." 14 C.F.R. § 382.35(b) (1996). According airlines such latitude strikes the most appropriate accommodation between competing concerns for airline safety on the one hand and equal access to air transportation for the disabled on the other. Airlines will often have to decide "on the spot" whether airline safety warrants an attendant, with incomplete information concerning the handicapped passenger's capability to evacuate the aircraft in case of an emergency. The risk of error in these partially informed decisions is unavoidable. A rule charging the airlines with the burden of a factual accuracy rendered unattainable by the circumstances would encourage airlines to err on the side of permitting unattended travel. In those cases where a handicapped individual could not in fact assist in his or

18

her own evacuation, but is nonetheless permitted to travel unattended, airline safety would suffer. Rather, airlines should be accorded reasonable latitude so the threat of legal liability does not countenance decisions which unduly jeopardize airway safety. Granted, a rule according such latitude is not without costs because it leaves some handicapped individuals without compensation for erroneous airline requirements of an attendant. However, so long as the error is reasonable, the resulting harm is outweighed by the risk posed to airline safety were such reasonable errors actionable.

Here, USAir's determination that plaintiff could not assist in her own evacuation without an attendant was reasonable. The plaintiff cannot stand or walk and is mobile only with the aid of a wheelchair. Plaintiff argues that she in fact could assist in her own evacuation because "she was capable of dropping to the floor of the aircraft and moving herself along the floor with her hands and arms." Plaintiff's Memo at 11. Even so, the defendant's determination that an attendant was necessary for airline safety was reasonable, even if possibly erroneous or mistaken.

However, there remains a disputed issue of fact as to whether USAir's decision to deny plaintiff unattended air transportation was subjectively motivated by a determination that

19

plaintiff could not assist in her evacuation or whether USAir was motivated by impermissible reasons. First, when USAir reservations personnel told plaintiff she must fly with an attendant, the USAir agent said the requirement arose from a general rule in USAir's manual prohibiting all blind and handicapped persons from traveling unattended. This is evidence that USAir was motivated by a blatantly unlawful presumption in their manual that all handicapped persons must fly with an attendant, presumably regardless of whether or not they can assist in their evacuation. Thus, USAir's claim that plaintiff cannot assist in her own evacuation appears to be an ad hoc justification for a decision that was reached on impermissible grounds.

In addition, plaintiff maintains that on her unattended flight from Boston to New Orleans USAir became concerned over her need for assistance in using the lavatory. Plaintiff states that while she was in the terminal's lavatory during a layover, three female flight attendants stood outside the stall and warned, "If we don't hurry up, they're going to take off without us." Harris Deposition at 63, 65. Plaintiff claims she was "under the impression [that] if [she] didn't leave then, they would have . . . left [her] sitting in there." Harris Deposition at 67. As plaintiff correctly points out, the regulations provide that "[a]

concern . . . that an individual with a disability may need to use inaccessible lavatory facilities" or may require "extensive special assistance . . . which carrier personnel are not obligated to provide is not a basis on which the carrier may require an attendant." 14 C.F.R. Part 382.35(a). A reasonable jury could conclude that USAir required an attendant so its personnel would not have to provide her with special assistance in using the lavatory.

Lastly, USAir's choice of attendants is further evidence that airline safety was not the motivating factor. USAir chose Kara, plaintiff's daughter, as an attendant, but Kara would not have been able to assist in evacuating plaintiff, who needed the assistance of two adult males to move her onto and off the airplane. Kara would not have been able to help her mother evacuate, but would have been able to do no more than ask for assistance herself. Also, Kara testified that defendant failed to explain to her why she was needed as an attendant and never gave her instructions as to what she would be required to do in case of an emergency. In light of these circumstances, a jury may reasonably conclude that Kara was required to travel with her mother for other than safety concerns.

As there are disputed issues of fact regarding the reasons that motivated USAir to require plaintiff to travel with an

21

attendant, summary judgment must be denied.

<u>Conclusion</u>

Defendant's motion for summary judgment must be and herewith is denied.

**SO ORDERED.**

_____
Shane Devine, Senior Judge
United States District Court

June 30, 1997

cc:   James H. Schulte, Esq.
      Mark T. Broth, Esq.